## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 02 2019, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of M.C. (Minor Child) and M.A.C. (Father)

M.A.C. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

April 2, 2019

Court of Appeals Case No. 18A-JT-2612

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No. 49D09-1805-JT-547

Child Advocates, Inc.,
*Appellee-Guardian ad Litem*

**Vaidik, Chief Judge.**

# Case Summary

[1] M.A.C. ("Father") appeals the termination of his parental rights to his daughter, M.C. ("Child"). We affirm.

# Facts and Procedural History

[2] Father and A.N. ("Mother") are the biological parents of Child, born in December 2013. Mother's parental rights were also terminated; however, she does not participate in this appeal and we therefore limit our narrative to the facts relevant to Father.

[3] In December 2015, Father was incarcerated when the Department of Child Services (DCS) removed Child from Mother's care. DCS placed Child with Mother's parents ("Grandparents") and filed a petition alleging that Child was a Child in Need of Services (CHINS). In April 2016, the trial court determined that Child was a CHINS after Mother admitted the allegations in DCS's petition and Father waived his right to a hearing. Following the hearing, the trial court ordered that Father participate in numerous services, including: a

fatherhood-engagement program, a substance-abuse assessment, and drug screens. Child remained placed with Grandparents.

[4] At some point, Father was released to probation. Then in August 2016, Father was charged with committing Level 5 felony burglary. *See* Ex. 30. He later pled guilty, had his probation revoked, and was re-incarcerated. Father remained incarcerated until June 2017, when he was placed on work release. Once on work release, Father attempted to complete a substance-abuse program at the Willows Center but was unsuccessful. In November, Father was released to probation and was ordered to complete a substance-abuse program provided by Veterans' Affairs, but Father was unsuccessful in that program too. Also, around that time, Father began exercising parenting time in therapeutic visitation with Child. Therapeutic visits were going well, and Father was appropriate during parenting time, so DCS dismissed its previously filed petition to terminate Father's parental rights to Child. The trial court then held a permanency hearing and changed Child's permanency plan back to reunification and ordered that Father exercise parenting time in supervised, not therapeutic, visitation. *See* Ex. 23.

[5] In January 2018, after Child's permanency plan was changed back to reunification, Father relapsed on narcotics and alcohol. *See* Tr. pp. 21-23. In March, Father's supervised-visitation facilitator discharged him for non-compliance because he had "three consecutive cancellations." *Id*. at 52. Then on April 2, while still on probation, Father was arrested and charged with Level 6 felony unlawful possession of a syringe and Class A misdemeanor operating a

vehicle while intoxicated endangering a person in Marion County. The next day, he was charged with Level 6 felony theft with a prior conviction for theft or conversion and Class A misdemeanor theft for crimes he allegedly committed in Hendricks County. Later that month, the trial court held another permanency hearing and Child's permanency plan was, once again, changed to adoption. Thereafter, DCS filed a new petition to terminate Father's parental rights to Child.

[6] In August, the trial court held a fact-finding hearing on the termination petition. At the time, Father was on work release and his new criminal charges were still pending. *See id.* at 16, 18-19. During the hearing, Family Case Manager (FCM) Dajour Crawford testified and stated that Father never completed a fatherhood-engagement program. FCM Crawford also said that she never received any drug screens for Father through a DCS referral. Finally, FCM Crawford testified that she believed that termination of Father's parental rights was in Child's best interest because Father was "given a [second] chance at reunification" and instead "he engaged in illegal substances as well as in illegal activities that made him become incarcerated." *Id.* at 85. Child's therapist, Emma Starks, also testified and said that Father and Child had formed a bond, and that it would greatly affect Child if Father were to be incarcerated again. Therapist Starks stated that the "number one key for [Child] right now" is "consistency." *Id.* at 49. Guardian ad litem (GAL) Ed Walker testified and recommended termination of Father's parental rights because he believed that Father's "substance issue . . . hasn't been remedied at this point." *Id.* at 96-97.

Father also testified and said that he completed a substance-abuse program through Cummins a month before the hearing, that he was four weeks into a subsequent program called "Lasting Recovery," and that he planned to attend Alcoholics Anonymous meetings after he completed the Lasting Recovery program. *Id*. at 119-21. Father acknowledged that the last time he lived with Child was in 2014 but said that he had been consistently visiting Child twice a week since May 2018. *See id*. at 19, 29.

[7] In September 2018, the trial court issued an order terminating Father's parental rights to Child. The order provides, in relevant part:

> 12. There is no evidence that [Father] ever submitted to [DCS] random drug screens.
>
> *****
>
> 14. A month prior to trial in this matter, [Father] had completed the first part of an intensive outpatient substance abuse program and was attending aftercare within his work release environment. He was also attending AA meetings.
>
> 15. [Father's] last relapse was as [recent] as April 2018, three to four months prior to this trial.
>
> 16. [Father] participated in Father Engagement beginning in March of 2017, while he was incarcerated. Although he first accomplished a lot, his compliance dropped off a few months after his release from incarceration and he stopped participating, resulting in being discharged unsuccessfully.

*****

26.  [Father] has obtained a criminal conviction record of at least five felonies within the last five years.

*****

28.  [Father] has had parenting time sporadically during the CHINS case, and since the end of May 2018 has consistently visited twice weekly.

29.  [Father's] parenting time had previously been closed in March of 2018, due to noncompliance.

*****

32.  Upon [Father's] release from jail in 2017, [DCS] dismissed his pending termination of parental rights case to give him another chance to work toward reunification, and on January 17, 2018, [Child's] plan for permanency was changed back to reunification.

33.  On April 18, 2018, [Child's] permanency plan returned to adoption with the CHINS Court finding, in-part, that [Father] had been arrested for drug related charges and admitted to overdosing, and that he had not been engaged in services since March.  [Father] failed to appear at this hearing.

34.  [Father] failed to work with the family case manager to set up a child and family team meeting to discuss the case after [Child's] permanency plan was changed to reunification.

*****

42. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by [Father]. [Father] has participated in some services late in the CHINS case. He has not participated in all services and has failed to exercise all his parenting time opportunities. After given a final chance at reunification he obtained two new felony cases which are pending and which could affect his current probation.[1] He also made the choice to relapse a few months prior to this trial.

43. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier to obtaining permanency for her through an adoption when [Father] has demonstrated a pattern of making poor choices that keeps from being in a position to offer permanency and parent.

Appellant's App. Vol. II pp. 54-55.

[8] Father now appeals.

# Discussion and Decision

[9] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that

---

[1] Father later pled guilty to committing Level 6 felony theft with a prior conviction for theft or conversion in Hendricks County and was sentenced to 545 days. *See* 32D05-1804-F6-000318. Father's Marion County charges are still pending, and a change of plea hearing is scheduled for May 20, 2019. *See* 49G25-1804-F6-010866.

are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[10] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court

finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[11] Father challenges the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied. He specifically contends that the trial court erred by terminating his parental rights for issues "related to [Child's] 'continued' placement outside [his] home, rather than [Child's] 'initial' placement" outside his home, and that the trial court's "distortion of the statute renders the termination process to be a foregone conclusion and violates the parent's due process right to receive a fundamentally fair hearing." Appellant's Br. p. 9.

[12] In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to their placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231; *see also In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) ("a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent"); *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005) ("it is not just the basis for the initial removal of the child that may be considered for the purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home"), *trans. denied.* Second, the trial court determines whether there is a reasonable probability that those conditions will

not be remedied. *In re K.T.K.*, 989 N.E.2d at 1231. "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of his future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[13] Here, Father failed to demonstrate that he was any closer to providing Child a safe, stable home than he was at the beginning of the CHINS case. The evidence shows that Father was incarcerated when Child was removed, that he has been incarcerated intermittently throughout Child's life, that he did not complete a fatherhood-engagement program, that he did not submit drug screens to DCS, and that in April 2018 he was charged with committing four new criminal offenses, two of which are felonies. The trial court's unchallenged findings on this issue support its conclusion that the conditions resulting in Child's removal will not be remedied. *See, e.g., In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's continued non-compliance with services support trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). To the extent that Father argues that he recently attempted to engage in services by completing a substance-abuse program through Cummins, we applaud him in his attempt to free himself from addiction. However, the trial court was well within its discretion to disregard the efforts Father made only shortly before termination and to

weigh more heavily his history of conduct. *See In re K.TK.*, 989 N.E.2d at 1234. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.[2]

[14] Affirmed.

Kirsch, J., and Altice, J., concur.

---

[2] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.